March 30, 1998

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

This letter of arrangement between Handy & Harman Refining Group, Inc. (the "Company") and Coopers & Lybrand L.L.P. sets forth the nature and scope of the services we will provide, the Company's required involvement and assistance in support of our services, the related fee arrangements and other terms and conditions designed to assure that our professional services are performed to achieve the mutually agreed upon objectives of the Company.

## SUMMARY OF SERVICES

We will audit the consolidated financial statements of the Company as of and for the period ending March 31, 1998, in accordance with generally accepted auditing standards. The objective of an audit is the expression of our opinion concerning whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Company in conformity with generally accepted accounting principles. We expect to deliver our report on or about April 23, 1998. If, for any reason, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

The Company may wish to include these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other offering at some future date. Since such participation was not contemplated at the time of this audit, this would constitute a new engagement and, accordingly, you agree that the aforementioned financial statements and our audit report, or reference to our Firm, will not be included in any such offering without our prior written permission.

Any additional services that you may request, and that we agree to provide, will be the subject of separate written arrangements.

The engagement will be led by:

George A. Ingram, partner, who will be responsible for assuring the overall quality, value, and timeliness of our services to you

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 2

**PWC/H&H017381**

Joseph J. Tiroletto, director, who will be responsible for managing the delivery of our servic
to you



EXHIBIT

A

David L. DeVore will serve as the concurring review partner and will be available in the absence of the engagement partner. This team will have access to a full range of specialists to assist as necessary.

## YOUR EXPECTATIONS

As part of our planning process, we have met with you to discuss your expectations of Coopers & Lybrand L.L.P., your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with Coopers & Lybrand L.L.P., and specific engagement arrangements and timing. Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations. Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance.

## TERMS AND CONDITIONS SUPPORTING FEE

As a result of our planning process, the Company and Coopers & Lybrand L.L.P. have agreed to a fee, subject to the following conditions.

To facilitate meeting our mutual objectives, the Company will provide in a timely manner audit schedules and supporting information, including timely communication of all significant accounting and financial reporting matters, as well as working space and clerical assistance as mutually agreed upon and as is normal and reasonable in the circumstances. When and if for any reason the Company is unable to provide such schedules, information and assistance, Coopers & Lybrand L.L.P. and the Company will mutually revise the fee to reflect additional services, if any, required of us to achieve these objectives. Such revisions will be set forth in the form of the attached "Amendment to Letter of Arrangement."

In providing our services, we will consult with the Company with respect to matters of accounting, financial reporting or other significant business issues. Accordingly, time necessary to effect a reasonable amount of such consultation is reflected in our fee. However, should a matter require research, consultation or audit work beyond that amount, Coopers & Lybrand L.L.P. and the Company will agree to an appropriate revision in services and fee. Such revisions will also be set forth in the form of the attached "Amendment to Letter of Arrangement."

Except for any changes in fees which may result from the circumstances described above, our fees will be limited to those set forth below.

**PWC/H&H017382**

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 3

## FEE

Our fees for the services described above will be $85,000, plus out-of-pocket expenses, subject to the terms and conditions above. Such expenses will include all travel, lodging, subsistence and an allocation of office charges in support of our services including computer usage, telephone, facsimile transmission, postage, photoreproduction and similar expenses.

Our fees and out-of-pocket expenses will be billed periodically as incurred. Invoices rendered are due and payable upon receipt.

## LIMITATIONS OF THE AUDITING PROCESS

Our audit will include procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the financial statements. As you are aware, however, there are inherent limitations in the auditing process. For example, audits are based on the concept of selective testing of the data being examined and are, therefore, subject to the limitation that misstatements due to errors or fraud, if they exist, may not be detected. Also, because of the characteristics of fraud, including attempts at concealment through collusion and forgery, a properly designed and executed audit may not detect a material misstatement due to fraud.

Similarly, in performing our audit we will be aware of the possibility that illegal acts may have occurred. However, it should be recognized that our audit provides no assurance that illegal acts generally will be detected, and only reasonable assurance that illegal acts having a direct and material effect on the determination of financial statement amounts will be detected. We will inform you with respect to material errors and fraud, or illegal acts that come to our attention during the course of our audit.

## RESPONSIBILITIES AS TO INTERNAL CONTROL

As a part of our audit, we will consider the Company's internal control, as required by generally accepted auditing standards, sufficient to plan the audit and to determine the nature, timing, and extent of auditing procedures necessary for expressing our opinion concerning the financial statements. You recognize that the financial statements and the establishment and maintenance of effective internal control over financial reporting are the responsibility of management. Appropriate supervisory review procedures are necessary to provide reasonable assurance that adopted policies and prescribed procedures are adhered to and to identify errors and fraud or illegal acts. An audit is not designed to provide assurance on internal control, including whether the Company has addressed or will be able to address on a timely basis any Year 2000 issues relating to computerized operations. As part of our consideration of the Company's internal control, however, we will inform you of matters that come to our attention that represent significant deficiencies in the design or operation of the internal control.

**PWC/H&H017383**

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 4

We are prepared at your request to perform a more in-depth assessment of the Company's internal control, and report our findings and recommendations, or to conduct an examination engagement on the effectiveness of your internal control.  We would be pleased to discuss fees for these services, which depend on their scope.


## REPRESENTATION FROM MANAGEMENT

Management is responsible for the fair presentation of the financial statements in conformity with generally accepted accounting principles, for making all financial records and related information available to us,  and for identifying and ensuring that the entity complies with the laws and regulations applicable to its activities.  At the conclusion of the engagement, the Company's management will provide to us a representation letter that, among other things, addresses these matters and confirms certain representations made during the audit, including, to the best of their knowledge and belief, the absence of fraud involving management or those employees who have significant roles in the entity's internal control, or others where it could have a material effect on the financial statements.

The Company hereby indemnifies Coopers & Lybrand L.L.P. and its partners, principals and employees, and holds them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Company's management, regardless of whether such person was acting in the Company's interest.  This indemnification will survive termination of this letter of arrangement.


## COMMUNICATIONS

At the conclusion of the engagement, we will provide management , in a mutually agreeable format, our recommendations designed to help the Company make improvements in its internal control and operations, and other matters that may come to our attention (see "Responsibilities as to Internal Control" above).

As part of this engagement we will ensure that certain additional matters are communicated to the appropriate members of management.  Such matters include (1) the initial selection of and changes in significant accounting policies and their application; (2) the process used by management in formulating particularly sensitive accounting estimates and the basis for our conclusions regarding the reasonableness of those estimates; (3)  audit adjustments that could, in our judgment, either individually or in the aggregate, have a significant effect on your financial reporting process; (4) any disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could
be significant to the financial statements or our report; (5) our views about matters that were the subject of management's consultation with other accountants about auditing and accounting matters; (6) major issues that were discussed with management in connection with the

**PWC/H&H017384**

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 5

retention of our services, including, among other matters, any discussions regarding the application of accounting principles and auditing standards; and (7) serious difficulties that we encountered in dealing with management related to the performance of the audit.

As part of our ongoing process of assessing the quality of our services, you may receive questionnaires from us and/or visits from senior partners not directly involved in providing services to you. We appreciate the attention that you give to these and value your commentary. Additionally, if you have questions or concerns about our services, you may contact Philip Schulz, the Business Assurance Partner-In-Charge responsible for the engagement team serving you.

## ACCESS TO WORKING PAPERS

The working papers for this engagement are the property of Coopers & Lybrand L.L.P. and constitute confidential information. Except as discussed below, any requests for access to our working papers will be discussed with you prior to making them available to requesting parties.

Our Firm, as well as all other major accounting firms, participates in a "peer review" program, covering our audit and accounting practices. This program requires that once every three years we subject our quality assurance practices to an examination by another accounting firm. As part of the process, the other firm will review a sample of our work. It is possible that the work we perform for you may be selected by the other firm for their review. If it is, they are bound by professional standards to keep all information confidential. If you object to having the work we do for you reviewed by our peer reviewer, please notify us in writing.

We may be requested to make certain working papers available to regulators pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of Coopers & Lybrand L.L.P. personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the regulators. The regulators may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies.

## SUBPOENAS

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

*********************

**PWC/H&H017385**

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 6

If the foregoing is in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us.  If you have any questions, please call George Ingram at (860)241-7010.

Very truly yours,


Attachment



SUBMITTED BY: George Ingram

ACCEPTED BY:                                                    DATE

TITLE



PWC/H&H017386

AMENDMENT #___ TO LETTER OF ARRANGEMENT

(Date)

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

The letter of arrangement dated March 30, 1998 between Coopers & Lybrand L.L.P. and Handy & Harman Refining Group, Inc. is hereby amended to reflect the following:

| Description of/Causes for Amendment | Estimated Fees Impact |
|---|---|
| | $ |
| Total this amendment | |
| Previous fee estimate | 85,000 |
| Revised fee estimate | $ |

Please sign the copy of this letter in the space provided and return it to us. If you should have any questions, please call George Ingram at (860)241-7406.

Very truly yours,

SUBMITTED BY: George Ingram

ACCEPTED BY:                                         DATE

TITLE

**PWC/H&H017387**

We believe that if the client is able to satisfy the criteria in paragraph 9 of FAS 80 regarding anticipated transactions, hedge accounting would be appropriate for both situations. Specifically, if H&H can accurately predict that it will have future sales of silver (that will result from purchasing the metal up front from its customers and then reselling the silver once the metal has been through the refining process), hedge accounting could be applied, where gains and losses on the indexed debt are deferred.

We also believe that paragraph 9 of FAS 80 would apply to situations regarding H&H's ability to deliver retention to satisfy debt payment. Specifically, changes in the amount of the debt obligation would be deferred on the balance sheet to the extent H&H could demonstrate that it will generate retention in the future that will yield gains and losses equivalent to those deferred on the debt (i.e., ounces of silver borrowed would have to be matched to ounces of silver expected to be produced and delivered to repay the debt). In this situation, however, the ounces of retention (that will be used to repay the debt) would have to be recognized on the accounting records at the spot price in existence at the time of the borrowing.

Lastly, we also believe H&H could apply hedge accounting by analogy in those situations where it has a firm commitment to refine silver in future months, and the initial amount of the debt (i.e., in ounces) can be matched to the expected quantity of silver to be refined.

Documents Attached

1. EITF Issue No 86-28 "Accounting Implications of Indexed Debt Instruments"
2. CM 87-12-014
3. FARM Section 80 Debt/Indexed Debt Instruments
4. Data Line 1996-87 Indexed Debt Instruments
5. Data Line 1986-75 FASB Emerging Issues Task Force Activities

**PWC/H&H017388**

## ACKNOWLEDGMENT OF ASSIGNMENT AND SUBROGATION

In consideration for the payment made by Those Certain Underwriters subscribing to Policy No. 834/FB9700166 ("the Policy") issued for the policy period 24 June 1997 to 24 June 2000 ("Underwriters"), and the other promises made by Underwriters in the Settlement Agreement between Underwriters and Handy & Harman Refining Group, Inc. ("HHRG"), executed contemporaneous with this document, HHRG agrees as follows:

1.    HHRG assigns to Underwriters all rights, title and interest in any and all claims which HHRG has, had, or may ever have as to all losses asserted by HHRG in the written claim of 22 February 2000 submitted by HHRG to Underwriters under the Policy, and which were more fully explained in a memorandum submitted to Underwriters on 9 March 2000 and more fully documented in a proof of loss submitted to Underwriters dated 9 October 2000, and which were the subject of claims submitted to Chubb and/or Federal Insurance Company and to Hiscox ("the Losses"), plus interest, costs, and punitive damages arising from the Losses, including but not limited to, any and all such claims against (a) Barry Wayne, Richard L. Searle, Louis Posado, Michael Verleysen, Manuel Seaone, Carlos Augspach, Frank Phillips, Jorge Washington, Erick Claudet, Linneo Klocker, Fernando Limo, Mario Seaone, and Jorge Passaro and their relatives, corporations, affiliates, and assigns; (b) Panexim and any and all employees or agents of Panexim or related entities; (c) SUNAT; (d) The Peruvian Government; (e) PriceWaterhouseCoopers and its predecessors, successors, agents and assigns; (f) Hermes; (g) Alex Stewart Assayers; (h) The Chubb Corporation or Federal Insurance Company and Hiscox. With the exception of any claims asserted against Chubb, Federal Insurance Company, or Hiscox, which are subject to paragraphs 11 and 12 of the Settlement Agreement referenced above, HHRG acknowledges that this assignment is full and complete and without reservation, for Underwriters to pursue recovery of the Losses.

2.    In addition to the assignment set forth in paragraph one, above, HHRG further acknowledges Underwriters as subrogee pursuant to the Policy as to the Losses asserted by HHRG.

HANDY & HARMAN REFINING
GROUP, INC.

By: _____

Title: _Jo Harwitt Capacity custodian LLC_

Date: _2/28/01_



EXHIBIT
B

LEXSEE 2003 CONN.SUPER.LEXIS 372

**Royal Insurance Co. v. Prudential Residential Services, L.P.**

**CV010185458**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAMFORD-NORWALK AT STAMFORD**

*2003 Conn. Super. LEXIS 372*

**February 13, 2003, Decided**
**February 13, 2003, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Plaintiff's motion to strike third counterclaim granted.

**LexisNexis(R) Headnotes**

**JUDGES:** TAGGART D. ADAMS, SUPERIOR COURT JUDGE.

**OPINIONBY:** TAGGART D. Adams

**OPINION:** MEMORANDUM OF DECISION RE MOTION TO STRIKE (125.00)

FACTS

On August 21, 2001, the plaintiff, Royal Insurance Company (Royal) commenced this subrogation action by service of the summons and complaint on the defendant, Prudential Residential Services Limited Partnership, doing business as Prudential Relocation Management (Prudential). In its single-count complaint against Prudential, the plaintiff alleges that Prudential breached its contract with the plaintiff's insured, John Helmers. Specifically, Royal alleges that John and Adele Glenn Helmers (Helmers) entered into a contract with Prudential for the purchase of a property owned by Prudential in Darien, Connecticut. The plaintiff further alleges that, pursuant to paragraph eighteen of the seller's rider, Prudential represented that the property did not contain any leaking fuel tanks, oil contamination or abandoned underground fuel oil tanks. [*2]  The sale was consummated on February 11, 1997, after which the Helmers allegedly discovered fuel oil in a stream located on the property, an oil leak from an underground fuel line and an abandoned underground fuel oil tank. Due to Prudential's alleged breach of contract, Royal, in its capacity as John Helmers' insurer, allegedly paid $ 65,000 in insurance proceeds to John Helmers for remediation of the property. Royal claims that, as a result, it is subrogated to the rights of its insured against Prudential to the extent of that payment.

On May 22, 2002, Prudential filed a motion to implead the Helmers and two additional parties as third-party defendants, alleging that they are potentially liable to Prudential for the plaintiff's claim. The motion was granted by the court (Ryan, J.) on June 4, 2002.

On September 12, 2002, Prudential filed a second amended answer, special defenses, and counterclaims. In its first counterclaim, for breach of contract, Prudential alleges that it entered into a contract with the Helmers in which the Helmers agreed to notify Prudential of any defects in the property within a specific time limit. Prudential alleges that the Helmers breached the contract [*3]  because they failed to notify it of any defects within that time limit. In its second counterclaim, Prudential alleges that, pursuant to its contract with the Helmers, Royal, as subrogee of John Helmers, is obligated to defend and indemnify Prudential in connection with the present action. In its third counterclaim, Prudential asserts a cause of action against Royal for vexatious litigation, based on the plaintiff's conduct in initiating and prosecuting the present action.

On September 26, 2002, the plaintiff filed a motion to strike all three counterclaims, accompanied by a memorandum in support. On October 16, 2002, Prudential filed a memorandum in opposition.

DISCUSSION

"A motion to strike tests the legal sufficiency of a cause of action and may properly be used to challenge the sufficiency of a counterclaim." *Fairfield Lease Corp. v. Romano's Auto Service, 4 Conn.App. 495, 496, 495 A.2d 286 (1985);* see also Practice Book § 10-39(a). "In determining the sufficiency of a [counterclaim] challenged by a [plaintiff's] motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Internal quotation [*4] marks omitted.) *Gazo v. Stamford, 255 Conn. 245, 260, 765 A.2d 505 (2001).* "A motion to strike admits all *facts* well pleaded; it does not admit *legal conclusions or the truth or accuracy of opinions* stated in the pleadings." (Emphasis in original; internal quotation marks omitted.) *Faulkner v. United Technologies Corp., 240 Conn. 576, 588, 693 A.2d 293 (1997).* "A motion to strike is properly granted if the [counterclaim] alleges mere conclusions of law that are unsupported by the facts alleged." *Novametrix Medical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 215, 618 A.2d 25 (1992).* "If facts provable in the [counterclaim] would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Gazo v. Stamford, supra, 260.*

Royal moves to strike all three counterclaims on the ground that Prudential may not assert counterclaims against it as subrogee in this subrogation action. Although the plaintiff concedes that it, as subrogee of its insured, John Helmers, stands in the place of its insured and is, therefore, subject to any and all defenses that Prudential has [*5] against its insured, it argues that a counterclaim to an action is not a defense. Prudential counters that the plaintiff, as subrogee, stands in the shoes of its insured and is, therefore, subject to any claims that arose out of the transaction that is the subject of the plaintiff's complaint.

"In its simplest form, subrogation allows a party who has paid a debt to 'step into the shoes' of another . . . to assume his or her legal rights against a third party to prevent that party's unjust enrichment . . . In that way, an insurance company, for example, can be substituted for the insured in an action against a third-party tortfeasor. The insured, having been paid by the insurer, in essence, transfers his rights against the tortfeasor to the insurer. The insurer, thus, can attempt to collect from the party that caused the loss to the extent expended by the insurer in satisfying the claim." (Citation omitted.) *Wasko v. Manella, 74 Conn.App. 32, 35-36, 811 A.2d 727 (2002).*

"The insurer's right of subrogation against third persons causing the loss paid by the insurer to the insured . . . arises out of the contract of insurance and is derived from the insured alone. Consequently, [*6] the insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. The principle has been frequently expressed in the form that the rights of the insurer against the wrongdoer cannot rise higher than the rights of the insured against such wrongdoer, since the insurer as subrogee . . . stands in the place of the insured and succeeds to whatever rights he may have in the matter. Therefore, *any defense* which a wrongdoer has against the insured is good against the insurer subrogated to the rights of the insured." (Emphasis added; internal quotation marks omitted.) *Orselet v. DeMatteo, 206 Conn. 542, 546-47, 539 A.2d 95 (1988).*

Although the Connecticut Supreme and Appellate Courts have not ruled on the question of whether a defendant may assert a counterclaim against an insurer in a subrogation action, other authorities have distinguished the defendant's right to bring a special defense from the defendant's right to bring a counterclaim. According to one such authority, "as a qualification to the concept that the subrogated insurer stands in the identical position as the insured subrogor, it may [*7] be held that the subrogee is not subject to counterclaims which the wrongdoer could have asserted had he been sued by the insured." 16 G. Couch, Insurance (2d Ed. 1983) § 61:236, p. 296. For example, in both *Seaco Ins. Co. v. Devine Bros., Inc.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 00 0374721 (June 13, 2001, Skolnick; J.) (29 Conn. L. Rptr. 742), and *Liberty Mutual Ins. Co. v. Luna, 40 Conn.Sup. 89, 481 A.2d 427 (1984),* the Superior Court rejected the proposition that a defendant is entitled to assert a counterclaim against a subrogee for the tortious conduct of its insured. In the former case, in which the insured was not a party to the action, the court explained that while a subrogee succeeds to the rights of the insured and is subject to all defenses which would have been available against the insured, "a counterclaim is not one of these rights or defenses and, therefore, cannot be asserted against a nonparty to the action." *Seaco Ins. Co. v. Devine Bros., Inc., supra,* 29 Conn. L. Rptr. 742-43.

Likewise, in *Liberty Mutual Ins. Co. v. Luna, supra, 40 Conn.Sup. 89-90,* a motor vehicle collision [*8] case, the defendant filed a counterclaim against the plaintiff, alleging that the plaintiff's insured was responsible for the collision. The court granted the plaintiff's motion to strike the counterclaim, concluding that "while the negligence of [the insured] may constitute a defense to the plaintiff's action, that is not to say that it provides the basis for [a counterclaim] against the plaintiff." *Id., 90.*

Other Superior Court decisions addressing this issue have rejected the proposition that a defendant is entitled to assert a counterclaim against a subrogee for the tortious conduct of its insured, albeit by implication. For example, in *Allstate Ins. Co. v. Appell, 39 Conn.Sup. 85, 85-86, 468 A.2d 949 (1983)*, and *Hartford Fire Ins. Co. v. Lewis, 16 Conn.Sup. 90 (1948)*, both courts ordered the subrogee's insured to be cited in to respond to the defendant's proposed counterclaims. n1

n1 This policy is consistent with the procedure enunciated in Practice Book § 10-10: "In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff and cross claims against any codefendant provided that each such counterclaim and cross claim arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint; *and if necessary, additional parties may be summoned in to answer any such counterclaim or cross claim.*" (Emphasis added.)

[*9]

The above cases, both explicitly and implicitly, have rejected the contention that a defendant can assert a counterclaim against a subrogee for the tortious conduct of its insured. Although these decisions are not binding on this court, their reasoning is nonetheless persuasive. Prudential's first and second counterclaims are both premised upon a contract between Prudential and the Helmers, a contract to which the plaintiff was not a party. Given that a contract cannot be enforced against a plaintiff who is not a party to the contract; *Reynolds v. Owen, 34 Conn.Sup. 107, 111, 380 A.2d 543 (1977)*; the court grants the plaintiff's motion to strike the first and second counterclaims. n2

n2 It should be noted that in counts three and four of its third-party complaint, filed July 12, 2002, Prudential alleges causes of action for both breach of contract and indemnification against the Helmers. These counts track almost verbatim the language of the first and second counterclaims filed against the plaintiff.

[*10]

In the third counterclaim, Prudential asserts a cause of action against the plaintiff for vexatious litigation. This presents a different situation, because this claim is based upon the plaintiff's alleged conduct, and not upon that of its insured. Prudential alleges that the "plaintiff has commenced and prosecuted the instant action against

Prudential Relocation without probable cause and with malicious intent to unjustly vex and trouble Prudential." Royal argues that the vexatious litigation claim is legally insufficient because Prudential cannot bring the claim when the underlying action is still pending. The defendant counters that pursuant to the policy of judicial economy, it may assert a counterclaim for vexatious litigation while the underlying case is still pending.

"In suits for vexatious litigation, it is recognized to be sound policy to require the plaintiff to allege that prior litigation terminated in his favor. This requirement serves to discourage unfounded litigation without impairing the presentation of honest but uncertain causes of action to the courts . . . The requirement furthermore serves the interest of finality of judicial decisions by preventing a person [*11] who was unsuccessful in the original proceeding from relitigating the same issues in a subsequent action for vexatious litigation." (Citation omitted; internal quotation marks omitted.) *Zeller v. Consolini, 235 Conn. 417, 424, 667 A.2d 64 (1995).* The Supreme Court endorsed this policy recently in dicta in *QSP, Inc. v. Aetna Casualty & Surety Co., 256 Conn. 343, 361, 773 A.2d 906 (2001).* A majority of Superior Court decisions have accepted this premise and have stricken vexatious litigation counterclaims when they are asserted within the same case that the counterclaiming party alleges to be vexatious. See, e.g., *Classic Limousine Airport Service, Inc. v. Alliance Limousine*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 99 0174911 (August 13, 2002, D'Andrea, J.T.R.), and cases cited therein; *Traba v. New Haven Ballet*, Superior Court, judicial district of New Haven, Docket No. CV 01 0453157 (October 2, 2001 Robinson, J.); *Gilbert v. Beaver Dam Assn., Stratford*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 00 0374905 (July 24, 2001, Rush, J.). n3 This court agrees with the policy [*12] stated in *Zeller v. Consolini* and with the majority of Superior Court decisions that have addressed this issue. In the present action, Prudential does not allege that prior litigation has terminated in its favor, but, rather, that "upon information and belief, the instant action will be terminated in [Prudential's] favor." For the above reasons the court grants the plaintiff's motion to strike the third counterclaim.

n3 But see *DeSarbo & Reichert P.C. v. Cardow*, Superior Court, judicial district of New Haven, Docket No. CV 94 0360368 (December 5, 1996, Hodgson, J.) (18 Conn. L. Rptr. 301); *Pattrell v. Ayers*, Superior Court, judicial district of Litchfield, Docket No. FA 89 0049825 (March 31, 1994, Dranginis, J.) (11 Conn. L. Rptr. 346, 9 C.S.C.R. 442); *Sonitrol Security Systems of*

2003 Conn. Super. LEXIS 372, *

*Hartford, Inc. v. Dept. of Administrative Services*, Superior Court, judicial district of Hartford-New Britain, Docket No. 702181 (November 10, 1992, Schaller, J.).

TAGGART D. ADAMS

SUPERIOR COURT JUDGE

LEXSEE 1999 CONN. SUPER. LEXIS 780

**SCP Corp. v. BankBoston fka Bank of Boston, Connecticut et al.**

**XO1CV 980116198**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF
WATERBURY, AT WATERBURY**

*1999 Conn. Super. LEXIS 780*

**March 18, 1999, Decided
March 18, 1999, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Motion to strike granted as to both counts of complaint addressed to WHTR Real Estate Limited Partnership.

**LexisNexis(R) Headnotes**

**JUDGES:** Beverly J. Hodgson, Judge of the Superior Court.

**OPINIONBY:** BEVERLY J. HODGSON

**OPINION:** Memorandum of Decision on Motion to Strike of WHTR Real Estate Limited Partnership

The defendant WHTR Real Estate Limited Partnership ("WHTR"), which purchased loan documents and a mortgage from the co-defendant bank, has moved to strike claims of breach of contract and conversion brought by the plaintiff SCP Corporation ("SCP"), a party that had held an option to purchase the same obligations.

The counts that are the subject of the motion to strike filed by WHTR are the third count, in which SCP alleges that WHTR is liable for an alleged breach of a contract signed by SCP and Bank of Boston Connecticut, the precursor to co-defendant BankBoston ("bank"), and the fourth count, in which SCP alleges that WHTR

unlawfully converted to its own use a claim for deficiency that the plaintiff alleges should have been conveyed to it [*2] by the bank.

The contract upon which the plaintiff bases its claims against WHTR has been appended to and incorporated by reference into the allegations of the complaint.

WHTR asserts that the plaintiff has not stated a cognizable claim against it in breach of contract because as a matter of law it had no obligation to SCP under the contract invoked. WHTR asserts that SCP has failed to state a cause of action in conversion and that, alternatively, the statute of limitation has expired on the plaintiff's conversion claim.

Standard of review

The function of a motion to strike is to test the legal sufficiency of the allegations of a complaint to state a claim upon which relief can be granted.  *Novametrix Medical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 214-15, 618 A.2d 25 (1992); Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432 (1989);* Practice Book 10-39.

In adjudicating a motion to strike, the court must construe the facts alleged in the complaint in the manner most favorable to the plaintiff.  *Bohan v. Last, 236 Conn. 670, 675, 674 A.2d 839 (1996); Sassone v. Lepore, 226 Conn. 773, 780, 629 A.2d 357 (1993); Novametrix Medical Systems,* [*3] *Inc. v. BOC Group, Inc., supra, 224 Conn. 215; Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 170, 544 A.2d 1185 (1988).* The requirement of favorable construction does not extend, however, to legal opinions or conclusions stated

in the complaint, but only to factual allegations and the facts "necessarily implied and fairly provable under the allegations." *Forbes v. Ballaro, 31 Conn. App. 235, 239, 624 A.2d 389 (1993).* Conclusory statements or statements of legal effect not supported by allegations of fact will not enable a complaint to withstand a motion to strike. *Mingachos v. CBS, Inc., 196 Conn. 91, 108, 491 A.2d 368 (1985); Fortini v New England Log Homes, Inc., 4 Conn. App. 132, 134-35, 492 A.2d 545 (1985),* cert. dismissed, *197 Conn. 801, 495 A.2d 280 (1985).*

Breach of contract claim (Third Count)

In the first forty-six paragraphs of its amended complaint, the plaintiff alleges that on June 19, 1992, it entered into a contract titled "Sale and Assignment Agreement" ("the Agreement") with the bank, which had loaned ten million dollars to a general partnership known as Sursum Corda Properties, which was developing a research facility with Yale University School of [*4] Medicine. The loan is alleged to have been evidenced by a promissory note and secured by a first mortgage on real property that the borrower was purchasing for the project. The bank is alleged to have commenced a foreclosure action and other enforcement actions against the borrower and guarantors and, while those actions were pending, to have entered into the Agreement with SCP.

Construction of the terms of a contract is a matter of law, and "where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Pesino v. Atlantic Bank of New York, 244 Conn. 85, 92, 709 A.2d 540 (1998).*

By the terms of the Agreement, SCP acquired the right to buy the loan documents and seek to substitute itself as the plaintiff in the foreclosure action upon payment of $ 2,250,000 if the purchase was made before December 15, 1992, or $ 3,250,000 if the purchase was made after that date but before March 31, 1993. The Agreement further provided that if the bank had taken title between the December and March dates, such that the claim remaining against the debtor was a claim for a deficiency, what would be conveyed [*5] to SCP at a closing, would be the deficiency claim only. The Agreement provides at paragraph 1(b) that the closing "shall occur on or before that date . . . which is the earlier to occur of (i) March 31, 1993 and (ii) fifteen (15) days following the date (the 'Title Date') on which the Assignor acquires fee simple absolute title to the Property . . ." The same paragraph provides that "if the Closing does not occur on or before the earlier of the dates set forth above, then, except as set forth in paragraph 18 hereof, all of the rights and obligations of

the parties hereto under this Agreement shall terminate immediately without notice or action of any kind whatsoever." In paragraph 18, the parties agreed to keep the Agreement and its terms confidential.

The plaintiff alleges that the bank breached the contract by failing to use its best efforts to pursue the foreclosure and enforcement actions in such a way that the deficiency claims would come into existence between December 15, 1992 and March 31, 1993. The plaintiff claims that the bank delayed the action, declared the plaintiff's rights to have expired as of March 31, 1993, and then sold the loan documents as part of a multi-million [*6] dollar sale of many loans to WHBB Real Estate Limited Partnership, a predecessor of WHTR, in September 1994.

This court has stricken claims against the bank except the claim of breach of the implied covenant of good faith and fair dealing with regard to the obligations set forth in paragraph 4(b) of the Agreement and the claim of breach of the confidentiality agreement.

The plaintiff claims that WHTR is liable because "it assumed and accepted the Bank's unperformed duties, including the Bank's obligation to convey to the plaintiff deficiency claims against Sursum and the Guarantors." The plaintiff also alleges that the agreement was "one of the documents assigned to WHBB by the Bank" and that SCP assumed the bank's duties and liabilities under that agreement because it honored certain obligations of the bank under other agreements, specifically, a Forbearance Agreement with the guarantors of the Sursum loan.

The plaintiff also alleges that "pursuant to paragraph 13 of the Sale and Assignment Agreement, and by virtue of the foregoing, WHBB and WHTR, as WHBB's successor by merger, are bound by the sale and Assignment Agreement to the same extent as was the Bank." [*7] The cited provision in the Agreement, paragraph 13, states that "this Agreement shall be binding on, and inure to the benefit of, the parties hereto and their successors and assigns."

The plaintiff has not alleged that WHBB or WHTR ever agreed to assume any liability of the bank for prior breaches of the Agreement. The plaintiff does not directly allege that the bank assigned the Agreement to WHBB; however, it alleges at paragraph 38 of the amended complaint that the bank assigned "the Note, the Mortgage and all other documents and claims relating to the Loan [to WHBB]." The plaintiff argues that this allegation supports the implication that the bank assigned the Agreement as a document "relating to the Loan."

1999 Conn. Super. LEXIS 780, *

In its motion to strike, WHTR asserts that there is no cause of action against an assignee for an expired obligation, and that the allegations of the complaint are insufficient to state a cause of action against it for the liabilities of the bank for any breach occurring before the expiration date.

This court has stricken claims against the bank that were based on the assertion that the bank's obligation to convey deficiency claims existed after March 31, 1993. [*8] The plain words of the contract defeat the plaintiff's conclusory allegations that such an obligation existed after March 31, 1993. Accordingly, even if the bank had assigned the Agreement to WHBB as the plaintiff has barely alleged, there was no obligation left to perform under that agreement because the bank's duty to convey any rights under the loan documents, including deficiency claims, ended on March 31, 1993, almost eighteen months before the transfer of the loan documents to WHBB.

The plaintiff asserts, however, that WHTR is liable for breaches of the Agreement by the bank that occurred before the alleged assignment of the Agreement to WHBB. While Connecticut's appellate courts do not appear to have had an occasion to consider precisely the issue of the liability of an assignee for pre-assignment breaches by the assignor, numerous other courts have ruled that to be liable for the assignor's nonperformance of duties under a contract, the assignee must have expressly assumed liability for the prior breaches. See, e.g., *Homa v. Friendly Mobile Manor, 93 Md. App. 337, 612 A.2d 322, 329-30 (Md. App. 1992),* appeal dismissed, *330 Md. 318, 624 A.2d 490 (Md. 1993); Rittenberg* [*9] *v. Donohoe Construction Co., Inc., 426 A.2d 338, 341-42 (D.C.App. 1981); Pumphrey v. Kehoe, 261 Md. App. 496, 276 A.2d 194 (Md. 1971); Tel-Hotel Corp. v. Lexnott Corp., 205 Misc. 576, 124 N.Y.S.2d 159 (1953); Litton ABS v. Red-Yellow Cab Co., 64 Ohio App. 2d 111, 411 N.E.2d 808, 810 (Ct.App. Ohio 1978); Quest v. Robertson, 71 Ill. App. 3d 678, 388 N.E.2d 1335, 27 Ill. Dec. 286* (2d Dist. Ill.), appeal denied, *79 Ill. 2d 617 (1979).*

Illustratively, in *Rittenberg v. Donohue Construction Co., Inc., supra, 426 A.2d 338,* a plaintiff sought to hold an assignee liable for past breaches of the assigned contract by the assignor. Noting that the complaint did "not allege that [the assignee] bound itself in any way to be responsible for performance of any lease covenants," the court ruled that an assignee is not liable for pre-assignment breaches absent an allegation that it assumed liability for those past breaches. *Id., 341.* Similarly, in *Litton ABS v. Red-Yellow Cab Co., supra, 411 N.E.2d 810,* the Ohio Court of Appeals ruled that "an assignment

does not cast upon the assignee any affirmative liability on the contract assigned unless there is an assumption [*10] of the assignor's obligations under the contract." The Ohio court observed that a third party's claims of fraud, misrepresentation and breach of warranty could be asserted only against the assignor, not against the assignee. See also *American National Co. v. Thompson Spot Welder Co., 30 Ohio App. 156, 164 N.E. 435 (Ohio App. 1928).*

Where, as in the case before this court, the assigned contract merely states that it is to be binding on assigns, an assignee does not become liable for any pre-assignment breaches or liabilities of the assignor, unless there is also an express acceptance of such liability at the time of assignment. *Rittenberg v. Donohoe Construction Co., Inc., supra, 426 A.2d 341-42.* This principle was applied in *Quest v. Robertson, supra, 388 N.E.2d 1335.* In that case, buyers of a car wash entered into an installment contract with the sellers. The contract contained the statement that it was "binding upon . . . the assigns of the seller and the buyer." The buyers assigned their interest to assignees who did not make the installment payments to the seller. The Appellate Court of Illinois ruled that the buyers' assignees were not liable for the buyers/assignors [*11] obligation to pay installments because they had not expressly agreed to assume that obligation. Accordingly, the court held that only the original buyers were responsible for the installment payments required by their contract with the sellers.

More recently and closer to home, another Superior Court Judge has granted a motion to strike claims against an assignee for pre-assignment breach, where the plaintiff did not allege any express agreement by the assignee to assume liability for such breach. *ICC Performance 2 Limited Partnership v. Pollack, 1997 Conn. Super. LEXIS 1042,* Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. 313596, 19 CONN. L. RPTR. 384, *1997 WL 200795* (April 16, 1997) (Levin, J.).

The Restatement of Contracts (Second) provides no definitive guidance on the issue of an assignee's duties with regard to prior breaches by an assignor. In the illustrations to 238 of the Restatement, which concerns delegation of duties to be performed by an assignor, the commentators cite a case indicating that the delegation does not include delegation of liability for past breaches by the assignor. The cited case is *Daniels v. Parker, 209 Ore. 419, 306 P.2d 735 (Ore. 1957).* [*12] In that case, a car dealership sold a car to a customer, then assigned the car loan to the defendant, who collected all payments. After the customer sold the car to another buyer, it was

discovered that the original car dealership had not held valid title to the car, which was a stolen car. The Oregon Supreme Court ruled that the defendant assignee was not liable for the original dealer's breach of contract.

All of the cases cited by the plaintiff concern an assignee's duty to perform the unperformed duties of the assignor under a contract which is still in force, not the duty to compensate the other party for breaches by the assign that occurred prior to the assignment. *Pargman v. Maguth, 2 N.J. Super. 33, 64 A.2d 456 (App. Div. N.J. 1949)*, on which the plaintiff relies, in fact applies the principle that the assignee is not liable for past acts of the assignor.

The plaintiff has not alleged that WHBB expressly agreed to assume liability for past breaches of the Agreement by the bank. As the cases cited above make clear, the provision in the Agreement itself that the agreement will be binding on assigns does not constitute express assumption of such liability. Without [*13] such an express assumption of the liabilities of another, the assignee is not liable for the pre-assignment breaches simply on the basis of the alleged assignment itself. The plaintiff has failed to state a cause of action in breach of contract against WHTR.

Conversion Claim (Count Four)

WHTR has moved to strike the fourth count of the complaint, in which the plaintiff alleges that WHTR converted to its own use deficiency claims that were the property of the plaintiff. The movant asserts two grounds: (1) the plaintiff has not described an ownership interest to which a conversion claim applies, and (2) the statute of limitation has passed on a conversion claim if one exists.

"Conversion" of an unadjudicated claim

WHTR asserts that the allegation that it acquired the loan documents by assignment after March 31, 1993, does not state a cause of action in conversion. Conversion is

> an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. It is some unauthorized act which deprives another of his property permanently or for an indefinite time, some unauthorized assumption and exercise of the [*14] powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse

to him, inconsistent with his right of dominion and to his harm.

*Aetna Life & Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-91, 646 A.2d 799 (1994).*

As the movant points out, a party claiming conversion must have a property interest in the thing that is claimed to have been converted. The plaintiff in this case alleges only that it should have been the owner of the deficiency claim, had the bank not breached its obligation to pursue the foreclosure action so that the deficiency claim would have come into existence before the Agreement terminated on March 31, 1993. The text of the Agreement defeats any claim that the plaintiff had a right to the deficiency claim even if that claim did not come into existence until after March 31, 1993, since the Agreement provides at paragraph 1(b) that if the closing does not occur on or before that date or within fifteen days of any earlier date on which the bank acquired title to the mortgaged property, "all the rights and obligations of the parties hereto under this Agreement shall [*15] terminate immediately without notice or action of any kind whatsoever" except the confidentiality rights specified in paragraph 18.

The plaintiff has not alleged that the deficiency claims came into existence before the termination date and that it was the owner of the claim before that date. While the plaintiff has a claim for breach of contract for the bank's alleged failure to use its best efforts to make these claims come into existence before the expiration date, its complaint in this regard is clearly that it should--but does not--own the deficiency claims; and it has asserted a claim against the bank for their value.

Even assuming that property other than chattels is subject to a conversion claim, an issue left open by the Supreme Court in *Aetna Life & Casualty Co. v. Union Trust Co., supra, 230 Conn. 790 n.6*, an essential element of a claim in conversion is an allegation of actual ownership of the asset claimed to have been converted. The plaintiff has alleged only a claim to ownership, not actual ownership.

The consequences of recognizing a claim for conversion where the property at issue is merely the subject of a claim, not of an established property right, [*16] are enormous. If this tort applied wherever a party had a claim to property, rather than actual ownership, no buyer could acquire contested property without being subject to tort liability from unknown and perhaps undiscoverable claimants of an asset.

1999 Conn. Super. LEXIS 780, *

The plaintiff has cited no case in which a party that alleged only a claim to property, not ownership of it, has been held to have stated a claim in conversion when another party acquired the asset from its ostensible owner. This court concludes that the allegations of the complaint, including as they do the incorporated text of the Agreement, do not state a cause of action in conversion against WHTR.

### Statute of limitation

Even if the allegation that acquisition of loan documents after expiration of another party's option were viewed as stating a cause of action in conversion, the statute of limitation bars the claim.

The event that the plaintiff identifies as the act of conversion was WHBB's and WHTR's receipt by transfer from the bank of the deficiency claims "with the intent to acquire such claims for themselves." (Amended complaint, paragraphs 54, 55.) The receipt by transfer is the only conduct claimed to give rise [*17] to the conversion claim. The plaintiff alleges that the transfer took place in September 1994 (Amended complaint, paragraph 38). The plaintiff did not commence its action against WHTR until January 15, 1998.

In its brief, the plaintiff claims that it alleged a continuous course of conduct by which WHTR asserted ownership of the deficiency claims. The text of the complaint does not support this argument. In paragraph 54 of the amended complaint, the plaintiff alleges that "WHBB and WHTR received by transfer from the Bank the deficiency claims with the intent to acquire such claims for themselves." Paragraph 55 expressly limits the claimed act of conversion to the acquisition of the claim, referring back to paragraph 54: *"By virtue of the foregoing,* WHBB and WHTR have asserted ownership rights over the deficiency claims to the exclusion of the plaintiff." (Emphasis added.)

Conversion is a tort, and the general three-year statute of limitation applicable to tort actions, *Conn. Gen. Stat. 52-577* applies. The plaintiff has not alleged any facts that would support any tolling doctrine. On its face, therefore, the conversion claim is time-barred.

### Conclusion

The motion [*18]  to strike is granted as to both counts of the complaint addressed to WHTR Real Estate Limited Partnership.

Beverly J. Hodgson

Judge of the Superior Court

LEXSEE 2001 CONN. SUPER. LEXIS 803

**Janet Bouchard v. Donald Bouchard**

**FA910502794S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF
HARTFORD, AT HARTFORD**

*2001 Conn. Super. LEXIS 803*

**March 16, 2001, Decided
March 16, 2001, Filed**

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**PRIOR HISTORY:** *Bouchard v. Sundberg, 2000 Conn. Super. LEXIS 1571* (Conn. Super. Ct., June 8, 2000)

**DISPOSITION:** Accordingly, evidence of such an agreement is relevant, and the motion in limine is denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Gruendel, J.

**OPINIONBY:** Gruendel

**OPINION:** MEMORANDUM OF DECISION RE: MOTIONS IN LIMINE

The plaintiff has filed two motions in limine to preclude the defendant from introducing certain evidence concerning the defendant's asserted defenses to the plaintiff's motion seeking to have him held in contempt for his alleged failure to contribute to the college expenses of the parties' children. The defenses are breach of contract by the plaintiff and accord and satisfaction.

DISCUSSION

I. MOTION IN LIMINE

In deciding these motions in limine, the court is not called upon to determine whether the asserted defenses are legally sufficient, n1 but rather to determine whether the evidence sought to be introduced is relevant. *State v. Lo Sacco, 26 Conn. App. 439, 444, 602 A.2d 589 (1992)*, citing *State v. Bell, 188 Conn. 406, 414, 450 A.2d 356 (1982)*. The defendant bears the burden of proving his defenses. [*2] *Lumbermens Mutual Casualty Co. v. Scully, 3 Conn. App. 240, 245 n.5, 486 A.2d 1141 (1985)*. The court has the right and the duty to exclude irrelevant evidence. *Matto v. Dermatopathology Associates of New York, 55 Conn. App. 592, 598, 739 A.2d 1284 (1999)*. "As a general matter, evidence is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree." *Burns v. Hanson, 249 Conn. 809, 825, 734 A.2d 964 (1999)* (internal quotation marks omitted). The test for admissibility is whether the evidence will assist the trier of fact in evaluating the claim. *Id. at 826-27.*

n1 The plaintiff has not moved to strike the defenses and has not moved for summary judgment on them.

Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that all things considered, the former is not worthy or safe to be admitted in proof of the latter . . . Evidence is not rendered [*3] inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. (Citations omitted; internal quotation marks omitted.)

*State v. Prioleau, 235 Conn. 274, 305, 664 A.2d 743 (1995).*

## II. ADMISSIBILITY OF EVIDENCE OF BREACH OF CONTRACT

The June 26, 1995 stipulated judgment dissolving the parties' marriage included a provision requiring "mandatory therapy and counseling involving the minor children and the parents." The purpose of the therapy was "to re-establish the relationship between the Husband and the children so the above described visitation may occur." The defendant repeatedly filed motions to compel the therapy, and several of those motions were granted by the court. On January 26, 1999, the court (Hon. John Brennan) denied the defendant's final motion to compel and vacated the order requiring counseling. The defendant asserts that no meaningful counseling ever took place, that the plaintiff breached the stipulated judgment and that her breach is a defense to the alleged contempt. The court finds that evidence of the [*4] alleged breach is not relevant in this proceeding and grants the motion in limine.

A stipulated judgment must be construed and regarded as a binding contract between the parties. *Griffin v. Planning and Zoning Commission of the Town of New Canaan, 30 Conn. App. 643, 650, 621 A.2d 1359 (1993); Caracansi v. Caracansi, 4 Conn. App. 645, 650, 496 A.2d 225,* cert. denied, *197 Conn. 805, 499 A.2d 56 (1985).* This principle applies to agreements for post-majority support which are incorporated into dissolution decrees. *Legg v. Legg, 44 Conn. App. 303, 306, 688 A.2d 1354 (1997).* Stipulated judgments must be interpreted consistently with accepted contract principles. *Guille v. Guille, 196 Conn. 260, 265, 492 A.2d 175 (1985).* Where the language of the contract is clear and unambiguous, as in this case, the scope and meaning of the language is a question of law rather than a question of fact. *Zadravecz v. Zadravecz, 39 Conn. App. 28, 31, 664 A.2d 303 (1995); Greenburg v. Greenburg, 26 Conn. App. 591, 596, 602 A.2d 1056 (1992).* The court may not add a term to the agreement. *Albrecht v. Albrecht, 19 Conn. App. 146, 157, 562 A.2d 528,* [*5] cert. denied, *212 Conn. 813, 565 A.2d 537 (1989).*

In a contempt action to enforce a judgment providing for post-majority support for the parties' children, the defenses available in an action for breach of contract are available to a party defending a contempt. n2 That is so because when the legislature amended *General Statutes Section 46b-66* to authorize such agreements to be incorporated into a stipulated judgment, the "limited

purpose" of the amendment was to permit those agreements to be enforced by contempt instead of by an independent action on the contract. *Albrecht v. Albrecht, supra, 19 Conn. App. 156-57.* Public policy considerations mandate this conclusion. First, proceeding in contempt is likely to be more efficient in terms of the time necessary to litigate the matter, an important consideration when the children are in college and the parties need a more immediate resolution of the issue. Secondly, because the right to enforce the judgment by contempt does not necessarily preclude an independent action on the contract, judicial economy requires that the same defenses be available in both.

> n2 The court has found no case holding that breach of contract is generally available as a defense to an action for contempt of a stipulated judgment. The court does not reach the question of whether breach of contract is available as a defense to an alleged contempt in any other context.

[*6]

Under contract law, a material breach by one party discharges the other party's subsequent duty to perform on the contract. "It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." 2 *Restatement (Second), Contracts Section 237,* p. 215 (1979); see also *State v. Lex Associates, 248 Conn. 612, 624, 730 A.2d 38 (1999).* Whether a breach is material depends on the circumstances of the case. *669 Atlantic Street Associates v. Atlantic-Rockland Stamford Associates, 43 Conn. App. 113, 128, 682 A.2d 572 (1996),* citing to 2 *Restatement (Second), Contracts, Section 241,* 237-38, comment (a) (1989).

In this case, the plaintiff's alleged breach is not relevant to the defendant's obligations to perform under the judgment. The alleged breach by the plaintiff asserted as a defense is that she failed to engage the children in counseling to promote visitation between them and the defendant. Generally, promises within a property settlement agreement in a divorce action are independent [*7] unless one promise is conditioned upon the performance of another promise. n3 15 S. Williston, Contracts (4th Ed., 2000) Section 44:19 p. 122. First, the promise on the part of the defendant to provide post-majority educational support in this case is not conditioned on the requirement that counseling take place. The agreement to engage the children in counseling was modifiable both by the terms of the

2001 Conn. Super. LEXIS 803, *

agreement and by the requirements of law. Indeed, in this case, the plaintiff was explicitly released from that obligation when the court modified the counseling requirement in 1999, when two of the parties' four children were still minors. The court retains jurisdiction to modify orders concerning custody and visitation to determine what is in the best interests of the children at a future time. *General Statutes, Section 46b-56*. The agreement by both parties to pay post-majority educational expenses, in contrast, was not modifiable either by the terms of the agreement n4 or in the law. *Albrecht, supra,* 19 Conn. App. 157. The fact that one promise was modifiable, and ultimately modified, while the other was not underscores the court's conclusion that the [*8] promises were not mutually dependent.

> n3 The judgment also provided that the plaintiff would establish a trust for the children's education. That requirement was a condition precedent to the defendant's obligation to contribute to educational expenses, and the defendant's promise was necessarily conditioned on it. The plaintiff's failure to have made the contribution would likely have been a defense.

> n4 The stipulation for judgment in this case provided that the college support obligation was not modifiable except for certain financial reasons. Those are not relevant here because the defendant has stipulated that he will not claim inability to pay as a defense to the claimed contempt.

In addition, evidence of breach of contract is irrelevant in this case because in Connecticut, the duty of a party to provide support is wholly independent of the right of a party to have visitation. *Bozzi v. Bozzi,* 177 Conn. 232, 237-38, 413 A.2d 834 (1979); *Emerick v. Emerick,* 28 Conn. App. 794, 802, 613 A.2d 1351, [*9] cert. denied, 224 Conn. 915, 617 A.2d 171 (1992). The general rule against construing promises as dependent in a stipulated agreement dissolving a marriage is particularly applicable here, where one promise related to visitation and the other to support.

## III. ADMISSIBILITY OF EVIDENCE OF ACCORD AND SATISFACTION

The defendant asserts an accord and satisfaction between the parties as a defense against the plaintiff's motion for contempt. The defendant seeks to offer evidence that on October 6, 1999, after more than four years of contentious post-judgment litigation, the parties entered into an agreement that the plaintiff would not pursue her claim for contributions from the defendant to the children's college expenses and that the defendant would not pursue other claims against the plaintiff including a civil suit alleging, *inter alia,* that the plaintiff and her present husband had alienated the children's affections. n5 A stipulation was drafted but was not signed by either party or by the party's respective attorneys. The defendant served requests to admit on the plaintiff seeking to establish that the alleged settlement had been reached by the parties, [*10] but the answers are not conclusive. It is undisputed that the children did not participate and were not represented in the settlement negotiations.

> n5 Several counts in the civil case were stricken by the court, including the counts alleging alienation of the children's affections. *Bouchard v. Sundberg,* 27 Conn. L. Rptr. No. 11, 407 (August 28, 2000).

The defendant does not claim that this purported settlement is to be summarily enforced, and his asserted defense would not lead to that result. The defendant only claims an accord and satisfaction.

To prove the defense of accord and satisfaction, the defendant must show that there was a dispute between the parties as to the existence or the amount of a debt and that the creditor and debtor negotiated a new agreement to settle the claim. *Munroe v. Emhart Corp.,* 46 Conn. App. 37, 42, 699 A.2d 213, cert. denied 243 Conn. 926, 701 A.2d 658 (1997). The accord is the contract for the settlement, and the execution or performance [*11] of the agreement is the satisfaction. *Davis v. Forman School,* 54 Conn. App. 841, 849, 738 A.2d 697 (1999); *W. H. McCune, Inc. v. Revzon,* 151 Conn. 107, 109, 193 A.2d 601 (1963). Unless there is mutual agreement or a meeting of the minds, there cannot be a valid accord. *Herbert S. Newman & Partners v. CFC Construction Ltd. Partnership,* 236 Conn. 750, 764, 674 A.2d 1313 (1996).

There has been no evidentiary hearing to establish whether there is a factual basis to establish the defense of accord and satisfaction. The only evidence before the court is the unsigned stipulation between the parties and the lawsuit that the defendant served upon the plaintiff and her husband contemporaneously with the alleged stipulation. Because the lawsuit is still pending, the defendant has not performed any accord to date. Nevertheless, the question before this court is not whether an accord and satisfaction has been proven, or even can be proven, but rather whether evidence of one is relevant. Whether there has been a mutual assent to an

2001 Conn. Super. LEXIS 803, *

accord is a question of fact reserved to the finder of fact. *Gillis v. Gillis, 21 Conn. App. 549, 552-53, 575 A.2d 230,* [*12] *cert. denied, 215 Conn. 815, 576 A.2d 546*

*(1990).* Accordingly, evidence of such an agreement is relevant, and the motion in limine is denied.

Gruendel, J.